James Sargent, on behalf of Medical Protective Company, with me is my partner, Maureen, who is going to talk to us about the case of Murphy McBride. I have two preliminary matters. One is that I would like to reserve three minutes. Fine. The second is I wanted to hand up a copy of a case not cited in our brief. It is a Third Circuit case, Cardin v. Westinghouse, a 1988 Judge Garth decision. It supports a point that was made in the brief, with Your Honor's permission. Go ahead. You can give it to the clerk over there. Preliminarily, Your Honor, this case presents at least one issue of first impression and provides an opportunity for this Court to clarify very important standards under the U.S. Constitution, with respect to the award of punitive damages. There are essentially two issues. The first issue involves mostly state law, questions of law, over which this Court, of course, has plenary review. And the second issue involves the constitutionality of a punitive damage award, which, of course, this Court under Letterman has de novo review of. Well, constitutionality of the punitive damages, is there another issue as to punitive damages such as they are too high without violating the Constitution? Well, Your Honor, there really are two issues. Yes, Your Honor. I believe that under our analysis of the punitive damages award, we have three arguments, essentially. Number one, that punitive damages were not subject to the law. Number two, that punitive damages were not subject to the law. Number three, that punitive damages were not called for in this case under state law standards or under federal law standards. Number two, the punitive damages award was so grossly excessive that it should be eliminated. Why doesn't Mr. Alf's testimony lay out the grounds for punitive damages in this case? Well, Your Honor, it might in some senses. I think that testimony has to be analyzed very carefully. The testimony I believe Your Honor is referring to is testimony which is essentially an acceptance by very short answers, yes or no, of counsel's recapitulation of the facts of the case. But he was there. Alf was there. He could have said that's not the case. There was a chance to cross-examine him. And he was cross-examined. And if you read the entirety of his testimony... He was buried. He was buried by counsel's questions. Counsel was very effective. He's a very effective counsel. And this was deer in the headlights. His testimony is actually contrary to the law of Pennsylvania, and it's contrary to the written documents in this file. For example, Alf said that he made the decision to assign one counsel to two doctors. Well, in fact, if you read his letters, number one, he wrote a letter saying this is temporary. We're parking until the cap fund drops down under 605 coverage. I want passive representation of Edelman. That was his terminology. And then he also said in the second letter, if you can't take this representation, then tell me. Now, the further point, Your Honors, is that under Rule 1.7 of the Rules of Professional Conduct in Pennsylvania, it's the attorney's responsibility. You know, I mean, that's the one thing that bothers me about this case, is the examination of Mr. Griffith, the testimony of Mr. Griffith, and permitting over your motion in limine and over your objection, permitting Mr. Griffith to say that the insurance company is responsible for the professional conduct of Mr. Kilcoyne as an attorney. And to me, that opens up a Pandora's box of every time an attorney representing an insurance company in a civil defense loses a case, is that going to open up the insurance company to a claim for bad faith in hiring an attorney who didn't win the case. And I see some rather frightening implications in permitting Mr. Griffith to testify as he did as to the standard of conduct by Mr. Kilcoyne, particularly in view of the fact that Mr. Kilcoyne said that the decision not to file a cross-claim and the decision to have a unified defense was something that he independently made. It wasn't forced upon him by the insurance company. It was discussed with his client. And in my view, that testimony is extremely prejudicial to the defense's case and perhaps should require a retrial. Your Honor, Judge Roth, I couldn't have said it more articulately. I'm very concerned because I think that this case opens the door for shifting legal malpractice to an insurance company under the bad faith statute. And I think that's absolutely inconsistent with the intention of that statute. There were many decisions, and I think Kilcoyne, who's a very experienced trial attorney, articulated his reasons for the decisions. And you have to understand that, for example, with respect to the insurer's duty to have a bona fide belief that the case is defensible, that's a very subjective standard. The insurer has to rely on its trial counsel. And Kilcoyne's testimony was very clear that there was an absolute – that he had an absolute strong belief that there was a 70 or 80 percent chance of success for Dr. Marcinson and that Edelman was the target defendant. And he also testified that the Cap Fund, who insured Edelman, and Edelman's trial counsel agreed with his assessment. That was all being communicated to a medical protective company. Let me make one point crystal clear with respect to the conflict issue. There is a fundamental defect with the conflict issue. There's absolutely not one shred of evidence in the entire transcript that establishes that because of this alleged conflict of interest, an excess jury verdict occurred. There's not one shred of evidence that says, absent that alleged conflict, Dr. Marcinson would have prevailed below. There's not one shred of evidence which says, absent that conflict, this case would have settled. There is evidence that they weren't able to really pin the blame on Edelman, and they really couldn't file a cross-claim. I don't know really why they couldn't file a cross-claim. There was the dual representation for 11 months, and then an attorney from Kevin Wright's office came in in May. That's correct. And then when Kat came into the picture at that point, I think he entered his appearance in Mr. Snyder in February of 2001, which was a year before the trial. Am I having my dates right? Something like that. I think that's correct. So it was about a year before the trial. I don't know why a cross-claim couldn't have been filed at any point. Under Pennsylvania Rule of Civil Procedure 1033, a cross-claim could have been filed at any time up to verdict. It might have required permission of the judge. But not by the same lawyer, obviously. But after there was a different lawyer, the different lawyer could have filed a cross-claim against Edelman. Well, that's a very good point, Your Honor. I'm not sure that a passive representation of Edelman would have prevented Kilcoyne from filing a cross-claim on behalf of Marcinson. There are plenty of cases, Your Honor. I mean, for example, under Pennsylvania law, it is not a conflict of interest for one attorney to represent husband and wife. Now, of course, all of those things would have had to have been discussed. But they didn't even get to the point of discussing whether Edelman would have objected to Kilcoyne filing a cross-claim because Kilcoyne made the decision it was unnecessary. I must admit that for 15 years I defended medical malpractice cases. And I never filed a cross-claim against a co-defendant because you didn't want to hand the case to the plaintiffs on a silver platter. Absolutely. So I think it is a reasonable decision for an attorney defending a medical malpractice case not to file a cross-claim. Let me make a couple of other important points very briefly. This case is dead in the water with respect to wrongful failure to settle. It is dead in the water because no matter how hard the plaintiff tries to explain what happened pre-trial, there never was an expressed willingness to settle. But the jury found against you, against Marcin. But there are no facts to sustain that verdict. There is an absolute dearth of any facts. How was the jury instructed on this? That there had to be an expressed willingness. To settle within the limits. Within policy limits. Within the limits. There is no question but that the jury was instructed on that. Absolutely no question. And that instruction was submitted by plaintiff. So that is the law of the case. But moreover, it is consistent with Pennsylvania law. It is consistent with decisions of this court and decisions of the Superior Court. It is always the plaintiff who has the obligation. Even Condia recently said, Your Honor. Yeah. What if we were to assume that that wasn't Pennsylvania law? That Pennsylvania law did not require that. Nonetheless, the judge instructed the jury that that was the case. Yet the jury came back and found for the plaintiff in this matter. Can the verdict stand under that circumstance? If we think that that requirement has never been enunciated in Pennsylvania law? Well, Your Honor. I believe that it is law of the case if the plaintiff has agreed to that instruction. They cannot now object to that instruction having been given to the jury. But I further would argue in that hypothetical that there is absolutely insufficient evidence to sustain that verdict on the record of this case. There never was an expressed willingness. And that cannot be more clear than it is in the facts of the case. Which is why the plaintiffs shift their focus and start arguing about this conflict issue. And the real concern about the conflict issue is it's no harm, no foul. I mean, there isn't any way that there is no causation that was testified to. And I will agree that Jim Griffith was an amazing witness in this case. I mean, he testified with expertise to every area of expertise under the sun. He was a medical expert. He was a sociologist. He was a legal expert. He even testified about what the CAT Fund was thinking.  And if the jury doesn't really understand where the lines and columns are. But what basis do you have for saying the jury was confused? Well, as Judge Siriga is suggesting, they concluded there was an expressed willingness in the absence of any facts. I mean, the facts are. But if they were wrong, they weren't confused. Well, they may have been wrong or they may not have understood those concepts with precision. And they were probably swayed by Jim Griffith's testimony, the fine attorney. But he was magical in that case. And they were obviously persuaded by Alf's admissions when he was the deer in the headlines. But the fact remains that in the context of this case, the plaintiff only had to do a few simple things to get MedPro to tender or to try to put together a settlement. If, as the plaintiff says, it would settle for a million from all three defendants, all the plaintiff had to do pre-verdict is go to MedPro and say, we need $200,000 from you or we need $150,000 from you. And go to the CAT fund and say, we need $300,000 from you or we need $365,000 from you. Instead, the plaintiff did not approach the defendants. But Kilcoyne knew Dr. Marcinson had problems. Kilcoyne knew he had problems. If you read all of Kilcoyne's testimony, you know, a trial is like a living thing, is what he says. Well, that was trial. Let's go before trial. You have two obviously and concededly respected judges saying the case is settled for a million six or a million two, whatever the figures were, a million five, million six. I mean, Kilcoyne knew that Marcinson's notes were not good. He also understood he's a good lawyer. He understood the realities of this thing. Let me point out. Your policy limits were $200,000. It is a word that sometimes you buck this. And it doesn't seem like a lot to offer when the downside risk could be very high if the jury was unfused. I agree, Judge Barry. And the flip side of that is why would MedPro have risked an excess verdict if it was just a matter of $200,000? In fact, the CAT fund came out to the same conclusion. We're not going to offer more than $300,000 because they heard Dr. Murphy's testimony. And he was so compelling on the subject. And they made their assessments. You mentioned the two trial judges. Number one, the first trial judge at the time she made her or the first settlement judge at the time she made her recommendation, there was a suggestion that this plaintiff's cancer was recurring because he had a lump in his neck. As it turned out, that was benign. So she had some influencing factor. The second trial judge was the trial judge who took Kilcoyne aside after Kilcoyne decimated the plaintiff's dermatologist and said, what are they going to do to dig out this case? And his opinion obviously changed. It is an organic process. And after Murphy testified, I think everybody's viewpoint had changed about this case. And to fault the MedPro for not tendering under Pennsylvania law before trial is absolutely wrong. As Condio said, an insurance carrier has no obligation to do anything which isn't required of it. That's not bad faith. Even though your insured wanted to settle it? Well, there's conflicting testimony on that. Wasn't it a lot of conflicting testimony that he wanted to settle? You know, Marcinson is exactly analogous to a cooperating witness in the criminal context. And you have to take his testimony with a grain of salt. This whole case is so bizarre at this point because MedicalPro, the insurance of Dr. Marcinson is now in because of the assignment feeding up on him. And Dr. Marcinson and the Jarenkos are now aligned. And the man that the Jarenkos beat up on below, all of this because of the assignment. And it is just very, very awkward. It's a wonderful creation of Pennsylvania law. It is a creation of Pennsylvania law. Let me make two very quick points. Carden, the case I handed up, that says in situations where you have a general verdict on two separate grounds and you can't tell which ground the jury relied on, but one of those is erroneous. You have to reverse. You have no choice. And that's a very important principle. And in CBG, a case which Judge Roth was on, that principle was affirmed with respect to punitive damages awards. If you can't tell the substantive basis for the punitive damage award, you've got to throw it all out. I also would argue very quickly that this is not a case where you have the excessiveness. And look at those Supreme Court cases closely. The Supreme Court is very concerned about how punitive is awarded. This is not a recidivist company. This is not a recidivist company. It's under the ratio. It's not under the ratio under State Farm. State Farm says it's excessive in an economic case where the compensatory award is substantial. It could not be more substantial in this case, Your Honor. $200,000 was our policy limit. We've now had to pay eight times that amount. And moreover, the eight times that amount makes the plaintiffs entirely whole. But didn't the CDG allow 9%, less than 10%? I mean, I didn't agree with it. Your Honor, but that was a different case. There was a recidivist. As in Willow Inn, there was a pattern, a continued pattern of flouting contractual rights in that case. The person knew they were doing the wrong thing, and they were complicit in a pattern to take— Well, the district court said that there was repeated refusal to tender. Sorry? The district court here said that there was repeated refusals to tender. Your Honor, that's not the standard. In Pennsylvania law, the standard is, was there an occasion? Look at the LaRocca case. You have to have the plaintiff expressing a willingness to settle within policy limits before the insurer has to tender. I have one question on punitives. Before you sit down, put aside the constitutionally excessive violation of due process because of a ratio or some other problem. What would our standard of review be, assuming we get to that point, as to whether the punitive damages are just too high? Under Pennsylvania law, would it not be abuse of discretion? The district judge abused her discretion in not granting your motion to reduce? Well, I think the analysis is whether there is an occasion for the award of punitive damages, which raises an interesting question. Well, that's the first question. Assuming we find an occasion for the award, assuming we get to that point, because your brief is— I mean, there's a lot of briefing on punitive damages, and you really haven't discussed them that much, and your time is up. I'm just asking, what would our standard of review be? I think the standard of review is abuse of discretion with respect to that component of it. But I think with respect to excessiveness, you've got a de novo standard under U.S. Supreme Court. There is one additional point, and that is that the state Supreme Court has never said that a mere finding of bad faith under the Pennsylvania statute justifies an award of punitive damages. But the district judge charged outrageousness in addition to bad faith. I understand that. So she didn't just rely on the finding of bad faith. Thank you, Your Honor. Let me ask you, the malpractice action against Mr. Kilcoyne, whatever happened to that? That's stated, pending the outcome here. And obviously, we'll ramp up once this court or another court makes its decision. A lot of litigation in this case. Absolutely, Your Honor. May I still have rebuttal time? Oh, you will have rebuttal. This is not the Ninth Circuit. Thank you very much, Judge Roth. Mr. Tanner, good morning. Thank you. Good morning, Your Honor. May it please the court, my name is Mark Tanner, appearing today on behalf of the Jurekos, the Appellees, and Cross Appellants. Good. I think you'd better, maybe you ought to start off with both the jury charge and what Pennsylvania law is with respect to making a demand within the settlement limits. Absolutely, Your Honor. As I'm sure the court is aware from our brief, we spent a great deal of time rejecting the notion advanced by medical protective that Pennsylvania law requires, allegedly, requires an offer to settle within the policy limits as an absolute condition precedent to a finding of bad faith. But as this court correctly pointed out today, Judge Roof charged the jury that they needed to find and express willingness to settle. And, in fact, they did. And, in fact, contrary to counsel's argument just moments ago, the record reflects an express willingness to settle within the policy limits. And I'll explain that. Willingness or demand? A demand and a willingness. Where's the demand? The demand came when SmithKline Beacham settled for $525,000. The plaintiffs came back and they said, we want $1.1 million to settle from the defense. Dr. Marcinson, at the time, had $1.2 million in coverage. He had $200,000 with medical protective. But that wasn't within medical protection's policy limits, and that's their argument. Well, then their argument has to be reduced to the point of absurdity. Because if a plaintiff has to demand, in a case that's worth somewhere in the excess coverage, has to make a demand inside the primary coverage before a primary carrier has to tender, then no primary carrier is ever going to tender. Because they're going to say, I'll hold on to my money and see what happens. And I can't be held accountable for bad faith if, in fact, the plaintiff never said, I'll take $199,000 on a case that might be worth a million when there's $1.2 million in coverage. Where do we find the evidence of that $1.1 million? Certainly. That's undisputed. It's in both briefs. On page 8524 of the record, plaintiff's demand, which was communicated through Judge DeBone, was $1.1 million to settle the case against the doctors. Dr. Marcinson had a $200,000 primary and $1 million in coverage from the fund. What is also significant in this case, because the MCARE or the CAT Fund is involved, is that the CAT Fund is a creature of statutory construction. They are prohibited from offering a nickel on behalf of a doctor until or unless that $200,000 has been tendered. And that was testified to both by Mr. Alf in the record and secondly by Bob Wager, the deputy director of the CAT Fund, who was asked, quote, question. Now I want to talk a little bit about lines of coverage again and how that works because I want to make this perfectly clear. Although you are not operating on behalf of the fund, am I correct that the fund at this time was not allowed to offer any money whatsoever from Dr. Marcinson's line of coverage until or unless there had been a tender? Is that accurate? Answer, that is correct. That is at page 551 of the record. So Medical Protective, if their contention is to be accepted that there has to be an offer to settle within the policy limits or the coverage, well, that exists in the record. $1.1 is within Dr. Marcinson's coverage. And that's the point that is made by the cases in their dicta that discuss the necessity of this law. That's the argument. I've understood his argument to be the $200,000. Well, if that's the argument, then that would be an argument which, if accepted by this court, not only has never been the direct holding of any case anywhere that I can find and has been rejected, in essence, by this court and Bell. Because Medical Protective could not require the CAT Fund to pay the million. They couldn't, but Medical Protective wouldn't be a defendant in this case if they did what they were supposed to do and tendered. The bottom line is Medical Protective deprived the CAT Fund of an opportunity to pay anything on behalf of Dr. Marcinson because of their dogged refusal to tender. The testimony is clear in this record that before the trial started, Mr. Alf said, and he wrote this, this is quoted verbatim from his notes, quote, there is no way, no matter what, they would tender the $200,000 policy. That line in the sand was drawn before the trial started, and it remained an immutable line throughout the course of this trial. That is bad faith. That is a reckless disregard for the rights of Dr. Marcinson, who was watching this case go down around him and who was begging his counsel, you have to settle. Let's just talk about the monies involved here first, see if I understand. Certainly. As a result of all of this, there was a verdict of $2.5 million. Correct. The insurance company, Medical Pro, assumed paid the Durankos $1.2, meaning the CAT, whatever it was. Didn't they get the $1.2? They did after the appeals were exhausted in the state court. Then there was a bad faith claim where there's been a verdict of $1.3 million plus delay damages plus interest for the Durankos by virtue of assignment, plus punitives of $6,250,000 by virtue of the assignment. So that, as I see it, we're around $10 million now that the Durankos are getting. Let me speak to that. As a result, bottom line, of the failure to tender $200,000, is that right? Your numbers are accurate. I think the manner in which it's characterized, I'd like to revisit for just a moment, Your Honor. It's an awful lot of money. It's the largest bad faith verdict in Pennsylvania's history, the papers say, or I think the judge said. That's warranted by MedPro's conduct. Back at the time when the Durankos got this verdict against Dr. Marcinson, he was uninsured for $1.3 million of it. The Durankos had a choice. They could take his house. They could take his practice. They could attach every payment that this doctor in Pennsylvania was going to get for the rest of his life from any third-party insurer. But they knew, and they did the right thing here. They felt bad for Dr. Marcinson because everybody had wanted to settle, and MedPro was the intransigent party. And they said, you know what, if you give us an assignment, we're not going to take your house. And that's the policy that underlies all of this. Either we are going to go down a dangerous slope for doctors who practice in this area when we say, well, it's an awful lot of money, and that's the way it worked out. To say they feel sorry for him, I think that's an exaggeration. Well, then no point of – Because maybe they would have gotten nothing except his house. Mr. Duranko lived that long. He had mulling and melanoma. Well, wait a minute. At the time – no, no, no, let's not get there. At the time of the trial, the cancer had – there was no cancer, and there was an 85% chance there would be no reoccurrence. Correct? I forget the percentage chance. Yes, 85% no reoccurrence. I think the testimony was both sides. Don't say if he had lived that long. I think that's unnecessary. My point – I apologize for being overly dramatic. My point is simply this, that when a plaintiff secures a verdict in excess of a doctor's coverage in Pennsylvania, they have a choice, and they can either attach the doctor's assets or, in the event such as this, where that excess verdict is the result, the direct result of an insurance carrier who is not complying with their obligations, they can take an assignment. And the law and the policy behind assignments has been part of Pennsylvania jurisprudence for decades. And it's a good law, and it's a good policy, because it allows the plaintiff to proceed to collect monies that are rightfully theirs, that would be awarded by a jury. It avoids the necessity of a doctor who threw no fault of his own because he had insurance, losing everything he worked for in his life savings. And I would ask that those policy considerations be maintained in this court's decision here. Bad faith action. Is the malpractice of the attorney representing the defendant paid for by the insurance company evidence of bad faith on the part of the insurance company? I think the answer to that, Judge Roth, would be it depends. And in this case, if this is something that the insurance company knows nothing about, if they didn't know anything about the cross-claim issue or what Mr. Kilcoyne was doing or not doing, I could see where they could come in and say, hey, you can't hold us accountable for bad faith. No, come on. The insurance company knows exactly what the attorney's doing. And that's precisely my point. And so you're saying, nevertheless, even though an attorney hired by the insurance company is using his individual professional judgment in how to conduct a case, that the insurance company can be held for bad faith if he doesn't win the case? My answer, Your Honor, is not that this attorney was using his individual independent judgment. That's what he testified to. And that's not what Mr. Alf testified to. Mr. Alf was not the attorney. The attorney testified that it was his decision to have a unified defense, that he discussed it with Dr. Marcinson. Mr. Alf, in his letter, said to Mr. Kilcoyne, you are being appointed to represent Dr. Erdmann until the CAT fund comes in. So it was a temporary assignment. Once it ended, Kilcoyne's determination to have a unified defense continued. And is there a case that says that the professional judgment of an attorney is evidence of bad faith on the part of an insurance company? I'm going to quote this court in the Klinger decision, Your Honor. Representation is not an excuse for the insurer's failure to perform its obligations under the policy it issued to the insured. And I quote that language because here the insurance company had a duty to assign Dr. Marcinson an independent counsel, not someone who would, quote, passively represent you. The rules of professional conduct require zealous representation. Your allegations of passive representation are not supported by the evidence in the record. Well, I think, Your Honor, that's both where... Or the acknowledgment that he was discussing the case with the insurance company, which any defense attorney is going to do, has to do. Your Honor, Dr. Marcinson testified that he wanted to testify against Edelman, and he was counseled by Kilcoyne not to do that. Okay, and I have made the same decision as a defense counsel in a malpractice case, that that is not a good tactic because of the implications it has in developing the plaintiff's case by the defendants. And as Judge Sirica pointed out earlier, Your Honor presupposes that this was independent judgment. It wasn't. Okay, but there is supposition that it was independent judgment, but there is no factual testimony in the record that I can find, and I have spent a lot of time going through it, that this was not independent judgment, and the testimony by Mr. Kilcoyne was that it was independent judgment. And, I mean, it concerns me, in bad faith, to what extent are you going to hold an insurance company responsible for the independent judgment, the professional judgment of an attorney? I'd like to address Your Honor's contention that Kilcoyne exercised independent judgment. Kilcoyne was, for a long time, an employee of Medical Protective. He then testified that roughly 80 to 90 percent of his business came from Medical Protective. He was told by Medical Protective, represent these two doctors. He did. As Judge Sirica pointed out— Temporarily. And the evidence, the undisputed evidence in the record is that it was a temporary representation until the cap fund came in, and that's what the letter— It was before the cap fund. It was only 11 months, and then Wright's office came in and appointed by Medical Protective. The point, as Judge Sirica made earlier, regardless of whether it was 11 months, 12 months, or through the entire litigation, once Kilcoyne represented both, he could never bring a claim against his former client or assert a claim. He could not be adverse to a former client. The only entity involved that could have gotten Dr. Marcinson a new and independent lawyer was Medical Protective, and they didn't. And the testimony was they didn't do it to save money. And the testimony was from Mr. Alf that they knew from the earliest day, that is his verbatim testimony, that he knew he was depriving Dr. Marcinson of that defense to assert a cross-claim from day one. There was no independent judgment here. There was no judgment after the facts were in. There was no judgment during trial. There was no judgment after the medical records were produced or the expert reports were produced. It was a financial decision made as soon as that complaint came across Mr. Alf's desk that we are going to assign Mr. Kilcoyne to represent both. We are going to deprive Dr. Marcinson. Temporarily. Temporarily. Temporarily or forever. It makes no difference under the rules of ethical conduct. You cannot bring a claim against a former client who you have represented in the same litigation. That is an absolute requirement. Mr. Alf testified that he knew that. Let me ask you this. What if we think that you made out your case with respect to failure to settle, but we don't think you made out your case with respect to the conflict? Where does the jury verdict stand? I think that the jury verdict should be affirmed because as Judge Roof indicated in her opinion, there was a case made out on the sufficiency of evidence concerning the failure to settle and there was a case made out on the sufficiency of evidence concerning Mr. Griffith. On either basis, this court should affirm that verdict. In the old days, I got reversed in a case called, I was representing the government. I got reversed in a case called United States v. Tarnapol because the jury came back with a general verdict and one of the objects of the conspiracy, there was no evidence as to, but not knowing that the jury did not decide on that ground, Third Circuit in its wisdom made a terrible mistake in reversing it. How do we know that the jury, because it could have found either one or both, that the jury did not find bad faith because of the conflict and not because of the failure to settle? I would concede it was a general verdict form, Your Honor, and much as it's unfair for counsel to try and conjecture as to what was in the minds of the jury as to confusion or otherwise, we can't do it here. We'll give you five minutes, Greg. I would simply suggest that where the evidence is as clear as it was in this case and on this record, it would enable the jury to find either way that the Third Circuit should not repeat what Your Honor characterized as the mistake in that other case. I would like, I guess, unless the court has other questions, just to take one or two minutes to address punitive damages. Yes, please. We've given you more time. Okay. Punitive damages in the review of the court's decision upholding the punitive awards was properly characterized, at least to be presented to this court, under a standard of review involving abusive discretion. Judge Sirico, I believe, already noted that the ratio involved here was certainly within the constitutional limits as defined by the United States Supreme Court. In fact, as counsel would have you believe, the ratio is not the policy limits. It's not $200,000 as compared to the ultimate award. The ratio is one of compensatory damages to the ultimate award. That's what the case law provides. The compensatory damages here that were stipulated by both sides in the record were $1.6 million, $1,658,345. You add to that, under the existing case law, the award of attorney's fees and interest for a total of $1.9 million, almost two. The ratio by strict arithmetic is 3.13 to one, which is certainly within constitutional limits. So it's within constitutional limits but sure is high. And the punitives are being, the compensation is being awarded to the drinkers because of the assignment for harm done to the doctor. That's because of the assignment. The analysis of punitive damages and whether they're warranted or not or their amount does not depend upon who's getting the punitive damages. It depends upon the misconduct that gave rise to them. And that is the analysis that the case law dictates we examine. Here, Medical Protective made a decision. This is a billion-dollar company. Their net worth was presented to the jury by stipulation. Punitive damage award has to send a message. That's the reason. It's not to heap additional compensation on a plaintiff. It's to send a message to both this company and an industry. And I would submit that a lesser award fails to send that message. Unless there are any further questions, I thank the court for their consideration. Anything else? Good. Mr. Tanner, thank you very much. Mr. Sergeant? Thank you, Judge Serra. Let me just point out a couple of things very quickly. Judge Barry, you asked about sort of the overview of this case. This case involved a plaintiff who four years before trial was said to have only 24 months to live. And the entire calculation of damages was premised on the notion that he would not survive until 2003. The trial occurred in 2005. His calculation of damages was his entire earnings, future earnings of $700,000. He actually lost only $3,000 for lost work for cancer treatment. So at the time he entered trial, he was in a situation where he'd survived his lymphoma. The spot that was on his nose had long since gone and disappeared. And he had $3,000 of actual damages. This plaintiff, with $3,000 of actual damages, has now gotten a $10 million verdict. I suggest that's not a just result. Let's go back to the demand. Is it your position that he should have made an offer to settle for $200,000? Well, Your Honor, there are several ways this could have been done. Obviously, there is a complexity here where you have two parties to the— No, no, no, but this happens all the time. When there's an excess coverage, are you saying that you have to make a demand only to the limits, within the limits of the primary insurer? Absolutely not. And don't forget, this is not a case where there was only excess coverage. Because of Edelman's role in this case, the CAT Fund had $1 coverage. It was a drop-down. It was that primary carrier for $1 million. Yeah, but that's not—how does that help Marcincin? That helps Marcincin because the demand going into trial was $1.1 million from both doctors. And at the time they went into trial, the CAT Fund understood that it had a problem in this case. And contrary to what counsel has said— I don't understand your answer. I'm sorry. Go ahead. I'm sorry, Your Honor. The demand of $1.1 million was made against Edelman and against Marcincin. And the CAT Fund had $1 coverage, a million dollars of primary coverage for Edelman. So it's quite clear that as far as Marcincin is concerned, certainly the demand could have been made to Marcincin, articulated by the plaintiff, give me your $200,000. But the problem is—and the LaRocca case is an analogy— where the plaintiff goes to the defendant, the one defendant or the one insurer, and says, I need $1.1 million. And there are factors beyond that insurer's control. That is, what the CAT Fund is going to offer. You can't say we're guilty of bad faith because we could never make up the $1.1 million. Well, I mean, that's obvious. And contrary— But it's also true that the CAT Fund couldn't pay out anything for Marcincin until you came up with the $200,000. That's absolutely incorrect. And when Mr. Wager— That's the testimony in the case. No, to the contrary, Your Honor. On A548 of the transcript, Wager testifying, questioning by Mr. Lerman, would there have been more money than $300,000 had medical protective tendered? The witness, there would not have been. We put $300,000 total, especially since I wrote for the two doctors on here. I mean, that's the figure he put on the case. But that's a different question from what we're asking here. But, Your Honor, the fact is that the CAT Fund participated in two attempts to put together a settlement, one prior to trial with SmithKline, one during trial. And in the course of the discussion between the CAT Fund and MedPro, MedPro's attorney, Kilcoyne, was asked by Snyder if he could come up with $150,000. And Kilcoyne said, yes. Alf said, yes, go for $150,000. And they presented that to Mr. Snyder. And he said, the CAT Fund's not going to move over $300,000. And that was during the trial of the case. Your Honor, there was never testimony here from a CAT Fund representative that the predicate to any further money on the CAT Fund's part was a tender by MedPro. In fact, to the contrary, the CAT Fund consistently said, we're not going over $300,000. And that puts it out of the control of MedPro. The rule that counsel argues for, plaintiff's counsel argues for, requires tender in every case by a primary carrier. Certainly that's not what is intended by the bad faith statute. Certainly that is not a rule which is in the interest of the general public. No, but we're interested in what he asked for, not what the tender was. The demand was $1.1 million. It never changed. And plaintiff never went to MedPro, for example, and said, we'll give your doctor a complete release if you tender your $200,000. And the plaintiff never went to the two of them, crossed the aisle in the courtroom and said, CAT Fund, if you put up $300,000 or if you put up $365,000 and MedPro, if you put up $200,000, this case settles. There was never any suggestion of numbers. And we believe there has to be an expression of willingness to settle within the policy limits. Whether more than one carrier, you have to go to both of them and work out a deal somehow. If both of you put up X amount of money within your policy, the case settles. And that never occurred in this case. We will review the transcript again, and we thank counsel for excellent work. Thank you very much. Take the matter under advisement. Thank you.